UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

―――

SY KHUE XIONG,

                    Petitioner,                    Case No. 1:11-cv-1202

v.                                                 Honorable Robert J. Jonker

CINDI S. CURTIN,

                    Respondent.
_____/

### REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Sy Khue Xiong presently is incarcerated at the Oaks Correctional Facility.  In 2009, following a bench trial in the Oakland County Circuit Court, Petitioner was found guilty of four counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b.  On December 21, 2009, he was sentenced to concurrent prison terms of 15 to 35 years for each count.  Petitioner appealed his judgment of conviction and sentence, and the Michigan Court of Appeals and Michigan Supreme Court denied his appeals on June 23, 2011, and October 24, 2011, respectively.

Petitioner raises essentially two grounds for relief in his petition: (1) he was denied effective assistance of counsel because counsel cross-examined only one witness, made no opening or closing statement at trial, and did not "explain about" a plea deal secured by counsel; and (2) he was denied [the right to counsel of his choice] where he and his counsel did not get along, counsel did nothing but yell at Petitioner, and the trial court denied Petitioner's request to obtain new counsel. (*See* Pet. 6, 7, docket #1.)

Respondent has filed an answer to the petition (docket #5) stating that the grounds should be denied because they are meritless. Petitioner has filed a reply to the answer (docket #14). Upon review and applying the AEDPA standards, I recommend that the petition be denied on the merits.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from charges that Petitioner sexually abused his stepdaughters while they were living in his household, and were between the ages of 13 and 16 years old. Petitioner was charged with four counts of first-degree criminal sexual conduct, two counts pertaining to his stepdaughter "MM," occurring between September and November 2008, and two counts pertaining to his stepdaughter "PM," occurring between September 3, 2005, and September 2, 2006. With respect to MM, the counts charged that Petitioner digitally penetrated her and performed cunnilingus on her when she was 13, 14 or 15 years old, and was a member of the same household. (Tr. I, at 18.)[1] With respect to PM, the counts charged that Petitioner digitally penetrated her and placed his penis inside her vagina when she was 13, 14 or 15 years old, and was a member of the same household. (*Id.*)

Petitioner retained his own counsel and was tried before a judge of the Oakland County Circuit Court on November 19 and 20, 2009. Petitioner, who is originally from Laos and had lived in the United States for 30 years by the time of his trial, was provided the services of a

---

[1]The transcripts for the proceedings in circuit court will be referenced as follows:

Tr. I - Nov. 19, 2009, Trial Transcript, docket #8;
Tr. II - Nov. 20, 2009, Trial Transcript, docket #9;
Sent. Tr. - Dec. 21, 2009, Sentencing Transcript, docket #10.

Hmong interpreter throughout his proceedings.  (*See id.* at 3-6.)  At the start of his trial, Petitioner's counsel informed the court that Petitioner wished to waive his right to a jury trial.  The court proceeded to ask Petitioner some questions in English.  Petitioner acknowledged that he understood some English, and the court told Petitioner to inform the court if he did not understand any of the questions.  (*Id.* at 5.)  The court explained to him that he had a right to be tried before a jury of twelve people; Petitioner acknowledged that he understood.  (*Id.* at 9.)  The court also explained that, if Petitioner waived his right, his case would be decided by the judge based on evidence presented in the courtroom; Petitioner acknowledged that he understood.  (*Id.*)  The court also gave Petitioner an opportunity to confer privately with one of his daughters in his own language.  After the conference, Petitioner's counsel represented that Petitioner had the waiver explained to him by the interpreter and he signed it.  (*Id.* at 13.)  Petitioner also acknowledged that had had a "sufficient opportunity" to confer with his counsel and his daughter regarding the waiver.  (*Id.*)  He acknowledged that he understood the choice to waive the right to a jury trial, and that he was not being forced or threatened to do so.  (*Id.* at 14-15.)

The prosecutor then delivered her opening statements, and after she did so, Petitioner's attorney objected in advance to any testimony by the brother of the victims as to what his sisters told him.  For his opening statement, Petitioner's counsel simply asked the court to assess the evidence and make a fair determination based on the government's burden of proof.  (*Id.* at 23.)

Pao Moua, the older brother of MM and PM, was the first witness to testify.  (Tr. I, at 27-28.)  In January 2009, he received a call from his uncle with information regarding MM and Petitioner.  He called MM and asked her what happened, and she admitted "it happened."  (*Id.* at 29.)  Petitioner's counsel then objected to any testimony about the content of MM's statements as

hearsay, and the court instructed Pao not to testify as to what MM said.  Pao testified that he asked

MM some questions and she told him "some information" about Petitioner.  (*Id.* at 30.)  At the time,

MM was living with their mother in Pontiac, Michigan, and Pao picked her up and took her to the

police station, where she gave a statement to the police.  (*Id.* at 31-33.)  MM's sister PM was living

in Florida at the time.  Pao testified that PM had previously lived with their mother in Pontiac,

Michigan, but she left home in December 2008.  She did not explain why she was leaving.  At the

end of Pao's testimony, Petitioner's counsel declined to ask him any questions.

MM then took the stand.  She testified that, prior to January 2009, she lived with her

mother and Petitioner in a house in Pontiac, Michigan.  While she was living there, Petitioner would

touch her on her chest, and once he touched her vagina.  (*Id.* at 42.)  He started touching her when

she was in fourth grade, under her clothes.  It usually occurred in her room, in the morning, when

nobody else was in the house.  When she was 12 or 13, just before she entered seventh grade, he

would call her into his room, force her to lie down, and put his finger inside her vagina.  (*Id.* at 58-

59.)  This happened twice.  (*Id.* at 59.)  One morning, when she was 15 years old, and a sophomore

in high school, she woke up early in the morning to use the bathroom.  Petitioner heard her and

called her into his room.  She went in and he told her to close the door.  After she did so, he grabbed

her and pulled down her pants.  He then put his tongue "on" her vagina, on the "part [she] pee[s] at."

(*Id.* at 52-54.)

MM also testified that if she tried to push Petitioner away when he was touching her,

he would hit her or threaten to do so.  (*Id.* at 74.)  The last time he hit her was the day that her sister

PM ran away.  MM wrote PM a letter on "My Space" telling her that she hoped PM would be happy.

(*Id.* at 78.)  Petitioner hit her after he found what she had written.

After MM finished testifying, the court held a recess.  Once the recess ended, Petitioner's counsel told the court:

> I've had an opportunity to meet with my client in detention and based on our meetings, I'm not asking any questions of this witness and she may be excused, your honor.

(*Id.* at 81.)

The following day, at the start of the proceedings, Petitioner's counsel told the court:

> My client wishes to address the Court.  I've had an opportunity to speak with his daughter and . . . my client, I believe, wishes to ask the Court to have me removed as his counsel, Your Honor.

(Tr. II, at 3.)  Petitioner then presented a letter to the court, which he had asked a fellow inmate to write for him.  Petitioner's counsel had not seen the letter, but counsel informed the court that he "know[s] who writes those letters and there's been many of those letters written throughout this case." (*Id.* at 4.)  Counsel informed the court that Petitioner had filed a grievance against him, which was received on October 27, 2009, and that counsel was defending it before the Attorney Grievance Commission.  Counsel stated that the grievance would have given him grounds to withdraw from the case, but he did not believe it was in his client's best interests.  Counsel stated,

> I spoke to my client and any time I speak to my client, he then tells me that everything is fine and that he won't write anymore letters.  And then I continue to get letters from this person who continues to give my client, quite frankly, extremely bad advice.

> My counsel in this case throughout has been as best as I can do with the 11 years of experience that I have handling these exact types of cases, Your Honor.  These are difficult cases and not many attorneys, as you know, handle these types of cases.

> I've negotiated strongly for my client, made some shrewd moves procedurally and I believe that I've protected his interests to the best of my ability, Your Honor.  And I would continue to do so if asked to do so by the Court, or to sit on standby, if the Court wishes to dismiss my services, Judge.

(*Id.* at 5.)

The court gave counsel an opportunity to review the letter, and counsel represented

that it contained "exactly the same charges leveled at the Attorney Grievance Level," for which

"there's absolutely no basis . . . whatsoever."  (*Id.* at 6.)  Counsel also stated:

> I believe the only relevant issue, Your Honor, is not asking any – or cross-examining the
> witness.  And I believe under the Court Rules, under the Ethics Rules, that is trial strategy
> as to my decision not to answer.  I believe there were some things said that could be argued
> in closing argument with regard to [MM]'s statements, and if I were to cross-examine her,
> I believe that would have opened up other lines of questions for rehabilitation with the
> prosecution.  That's my response to the allegation.
>
> The other allegations have been answered previously in my response to the Grievance
> Commission and I believe are baseless.

(*Id.* at 6-7.)

The prosecuting attorney added that, at the preliminary exam, she told Petitioner's

counsel that she could have added "a great deal more charges" based upon information from the

victims.  (*Id.* at 7.)  Petitioner's counsel responded:

> And I specifically represented . . . that to my client and to his family numerous times.
> And I believe it bore it out at the testimony from this witness, that we could have had
> 30 counts versus four in this matter.  So that's the reason why the preliminary exam
> was waived. . . .

(*Id.* at 8.)

The court stated, "Well, I know you always get these jailhouse attorneys.  They know

so much, that's why they're in jail and not out in the streets."  (*Id.*)  The court then concluded that

it would not allow or require counsel to withdraw, "not at this late date."  (*Id.*)

The government then called MM's sister PM to testify.  PM lived with MM, their

mother, and Petitioner in Pontiac, Michigan, until December 2008, when PM ran away from home.

She left because she wanted to escape sexual assaults from Petitioner.  The assaults started when she

was in elementary and/or middle school.  When she was in fifth grade, Petitioner gave her kisses on the lips.  When she was in sixth, seventh, and eighth grade, he would touch her "breasts, butt, [and] vagina" with his hands.  (*Id.* at 15.)  When she was in the eighth grade, at the age of 12 or 13, he started touching her with his mouth as well.  He would do it in one of the rooms of the house, when they were alone.  When she was in the ninth grade, he started to have sex with her, putting his penis in her vagina.  (*Id.* at 24.)  He did this a couple of times a week, usually in the early morning or late at night when everyone else was sleeping.  (*Id.* at 26.)

If PM did not comply, or if she tried to fight back, Petitioner would hold her down or would punish her by hitting her with extension cords or hangers.  (*Id.* at 33-34.)  The last time he beat her was in December 2008, on the last day of her first semester of college.  She started to testify that, "he says the reason why I'm getting hit is because when my mom --," but Petitioner's attorney interrupted her.  (*Id.* at 36.)  Counsel objected that "she's testifying as to other crimes or wrongs that are happening that aren't related to any of the alleged sexual assaults."  (*Id.*)  The attorney for the prosecution argued that the incidents were relevant to PM's credibility.  Petitioner's physical abuse was the reason she kept the sexual conduct to herself, even though it had been occurring since she was in elementary school.  (*Id.*)  The court overruled the objection.

PM's mother and sister MM were present the last time that Petitioner beat PM.  PM took pictures of bruises on her arms and legs from the beating, and the government submitted the pictures for admission as evidence.  Petitioner's counsel objected to admission of the pictures, arguing that they were irrelevant to the charges, but the court overruled the objection.

PM also testified that she saw Petitioner touch MM "a couple of times."  (*Id.* at 41.)  He would "touch her boobs and sometimes he would go to her vagina."  (*Id.*)

On cross-examination, Petitioner's counsel asked PM why MM testified that no one else witnessed Petitioner touching MM.  PM responded that "she wouldn't notice that I notice things, but I see things . . . it doesn't take a rocket scientist to know that something isn't right and why would he be going in there . . . [a]fter she just took a shower and she's not dressed yet?"  (*Id.* at 44.)

The court proceeded to question PM to clarify the events that occurred on December 10, 2008, the last time that Petitioner beat her.  PM stated that when she came home from class that day, Petitioner told her that her mother and sister went to her school and did not see her, so that is why he beat her.  (*Id.* at 47.)  The following morning, Petitioner entered the room where PM was sleeping and told her that he wanted to put some medicine on her skin.  He then had sex with her.  On December 19, 2008, she left her home to move in with her boyfriend.  (*Id.* at 48.)

The government then called Kia Ly as a witness.  Ms. Ly is a certified interpreter in the Hmong language.  (*Id.* at 53.)  She was present with Petitioner when he was interviewed by Detective McDougal of the state police in Pontiac, Michigan, on February 6, 2009.  (*Id.* at 54.)  She interpreted McDougal's questions from English to Hmong for Petitioner, and interpreted Petitioner's answers from Hmong to English.  She reviewed McDougal's notes from the interview and confirmed that they accurately reflect the conversation that occurred between Petitioner and McDougal.

Detective Paul McDougal testified that he is a detective for the Pontiac Police Department.  He met with Petitioner on February 6, 2009, at Petitioner's house in Pontiac.  (*Id.* at 62.)  Ms. Ly and a DHS worker, Eliza Burlingame, were also present.  (*Id.* at 60-61.)  Detective McDougal was wearing "plain clothes" that day rather than a police uniform.  (*Id.* at 62.)  He asked

Petitioner if he would be willing to come to the police department for questioning, and Petitioner agreed.  Petitioner was then transported to the station by Detective McDougal, accompanied by Ms. Ly.  McDougal told Petitioner that he was free to leave; he did not recall putting Petitioner in handcuffs.

Petitioner's counsel interjected to "voir dire" Detective McDougal regarding the circumstances of his interaction with Petitioner.  (*Id.* at 65.)  Detective McDougal reiterated that he was wearing plain clothes when he met with Petitioner, and he explained that he arrived at Petitioner's house in an unmarked squad car that did not contain a cage.  (*Id.* at 65-66.)  When he asked Petitioner to come to the police station, Petitioner agreed to do so, but their conversation at the house was not recorded or documented in a police report.  (*Id.* at 67.)  McDougal acknowledged that he "patted" Petitioner down, but could not recall whether he put Petitioner in handcuffs.  (*Id.* at 68.)  McDougal also acknowledged that some of the interview rooms at the police station have sound and/or video recording capability, but McDougal chose not to use one of those rooms, and his interview with Petitioner was not recorded.  (*Id.* at 69.)  McDougal did not think it was necessary to read Petitioner his *Miranda* rights because Petitioner was "cooperative," and he agreed to be interviewed at the police station.  (*Id.* at 70.)  Also, McDougal told Petitioner that he was free to leave.

Petitioner's counsel then called Ms. Ly back to the stand.  Ms. Ly confirmed that, at Petitioner's house and at the station, Detective McDougal told Petitioner that he was free to leave. (*Id.* at 71-72.)  Also, Plaintiff was not in handcuffs at any time.

McDougal then returned to the stand again to continue his testimony.  According to McDougal, Petitioner acknowledged that he touched MM's breast and bare chest when they were

"playing." (*Id.* at 74.)  Petitioner also indicated that he inserted his fingers into her vagina because she had not started her menstrual cycle.  (*Id.*)  He stated that he had "vaginal/penis" sex with PM at least four times.  (*Id.* at 76.)  Petitioner also told Detective McDougal that he had performed oral sex on PM, but she did it to him as well.  (*Id.* at 77.)  Petitioner also acknowledged touching PM's breasts, putting his tongue in her mouth, and beating her with an electrical cord.  (*Id.* at 78-79.)  He claimed that he beat PM with a cord because she stole something from JC Penney, and that he beat MM with an electrical cord because she had stolen something from the house.  (*Id.* at 80.)

On cross-examination, Detective McDougal acknowledged that Petitioner never indicated that he put his finger in MM's vagina for sexual purposes, that Petitioner denied putting his tongue on her vagina, and that Petitioner claimed that PM had pursued him.  (*Id.* at 81-82.)

After McDougal's testimony, the government rested its case.  Petitioner's counsel then called Petitioner to the stand to testify in his defense.  Petitioner testified that he used his finger to check MM because she had not started her menstrual cycle.  (*Id.* at 85.)  He did this only one time. He never used his tongue on her vagina.  He acknowledged having sex with PM, but claimed that it was consensual.  (*Id.* at 86.)

On cross-examination, Petitioner acknowledged that he never asked MM's mother to check and see why MM had not started her menstrual cycle, and he never took her to the doctor for that purpose.  (*Id.* at 87.)  After Petitioner's testimony, the defense presented no other evidence.

In his closing arguments, Petitioner's counsel acknowledged Petitioner's testimony that he put his finger in MM's vagina, but counsel argued that it was not for a sexual purpose. Counsel also argued that MM never stated that Petitioner put his tongue "inside" her vagina, only that he put it "on" her vagina, which was not enough to prove sexual penetration beyond a

reasonable doubt.  (*Id.* at 94.)  Counsel explained that he did not attempt to cross-examine MM because her testimony regarding whether Petitioner's tongue was "on or in" her vagina was somewhat unclear, but in the end she testified only that it was "on" her vagina, supporting Petitioner's defense that there was no penetration.  (*Id.* at 95.)  Counsel also acknowledged that Petitioner admitted penetrating PM's vagina with his penis, but he did not acknowledge inserting his finger into her vagina.  (*Id.*)

The Court found Plaintiff guilty on all four counts and subsequently sentenced him to 15 to 35 years of imprisonment for each count.

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  In a brief prepared by counsel, Petitioner argued that he was denied his right to the effective assistance of counsel for the following reasons: (1) counsel failed to cross-examine any witnesses, particularly regarding their motivations for making allegations against Petitioner; (2) counsel did not file a motion to suppress Petitioner's statements to the detective; (3) counsel did not file a motion to challenge the prosecutions "Notice of Intent to Introduce Evidence of [sic] Pursuant to MCL 768.27a."; (4) counsel waived Petitioner's right to a jury trial; (5) counsel made no opening or closing statements; and (6) counsel called no witnesses other than Petitioner.  (*See* Def.-Appellant's Br. on Appeal 8-9, docket #11.)

In a supplemental brief filed in *pro per* by Petitioner, he argued that he was denied the right to the effective assistance of counsel and a "conflict free" attorney.  (*See* Def.-Appellant's Supplemental Br. on Appeal, docket #11.)  Petitioner argued that the trial court should have granted his request for new counsel and/or motion for a continuance to obtain new counsel, due to counsel's

- 11 -

inexperience and a breakdown in communication between Petitioner and his counsel.  In an affidavit attached to his brief, Petitioner also complained that his counsel "never explained anything to me about the court, laws, plea deal.[2]  Nothing."  (Def.-Appellant's Aff. in Supp. of Supplemental Br. on Appeal, docket #11.)

Petitioner's counsel also filed a motion to remand for an evidentiary hearing,[3] which was denied.  By unpublished opinion issued on June 23, 2011, the Michigan Court of Appeals rejected the appellate arguments and affirmed Petitioner's convictions and sentences.  (6/23/2011 Mich. Ct. App. Op. (MCOA Op.), docket #11.)

Petitioner then filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same issues raised before and rejected by the Michigan Court of Appeals.  By order entered October 24, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 10/24/2011 Mich. Order, docket #12.)

In the instant action, Petitioner raises essentially the same claims that he presented on appeal.  In Ground One, he claims that he was denied the effective assistance of counsel for the reasons stated on appeal, providing the following summary of facts:

> [Petitioner's] attorney never cross examined but one witness, he did nothing for [Petitioner] . . . no opening or closing statement[.] [Petitioner's] attorney didn't explain about plea deal . . . even knowing [Petitioner] had limited understanding of the English language.

(Pet., docket #1, Page ID#6.)

---

[2]In his affidavit, Petitioner referenced a letter from his counsel dated September 16, 2010, which states, "I had a plea deal secured that would have reduced your sentence by ten years.  You disregarded my advice and the advice of your daughter and proceeded to trial."  (*See* 9/16/2010 Letter from W. McNiel, docket #11.)

[3]*See People v. Ginther*, 390 Mich. 436 (1973).

In Ground Two, Petitioner claims that he was denied his "6th Amendment Right to Effective Assistance of Counsel & Conflict Free Attorney," providing the following summary of facts:

> [Petitioner] & Attorney never got along with each other[.] [Petitioner] early on knew his attorney wasn't doing anything for him, this created a conflict between them, he did nothing but yell at [Petitioner] everytime he seen him. [Petitioner] tr[ied] two time[s] to get rid[] of his Attorney.

(*Id.* at Page ID#7.)

## <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). The Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at

655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth by the Supreme Court, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–406). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 2014 WL 1612424, at *4 (Apr. 23, 2014) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011)).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131

S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).  The presumption, however, is not irrebuttable.  *Johnson*, 133 S. Ct. 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

          The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

**Ground One: Ineffective Assistance of Counsel**

Petitioner asserts that his counsel was ineffective for a variety of reasons. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As the Supreme Court has observed, while "'[s]urmounting *Strickland*'s high bar is

- 16 -

never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under §
2254(d) is all the more difficult." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Padilla
v. Kentucky*, 559 U.S. 356, 371 (2010)).  Because the standards under both *Strickland* and § 2254(d)
are highly deferential, "when the two apply in tandem, review is 'doubly' so."  *Harrington*, 131 S.
Ct. at 788 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  In those circumstances,
"[t]he question before the habeas court is "whether there is any reasonable argument that counsel
satisfied *Strickland*'s deferential standard."  *Id.*

      The Michigan Court of Appeals reviewed the trial court record and, applying the
standard for ineffective assistance from *Strickland*,[4] acknowledged that "counsel erred in some
respects," but determined that counsel's actions did not result in prejudice.  (MCOA Op. 2.)

> Defendant argues that counsel had him waive a jury trial. However, defendant
> clearly indicated on the record that he wished to waive the jury. The concept of the
> jury was thoroughly explained and defendant was advised that only the court, as
> opposed to 12 jurors, would have to be convinced of his guilt. Moreover, the court
> facilitated defendant consulting with his daughter (not one of the victims)
> confidentially, in his native language, before making a final decision. Defendant then
> reiterated that he wished to waive the jury and confirmed that he was neither forced
> nor threatened to do so, nor promised anything. Defendant also signed a waiver of
> jury form and verified that he did so freely. Defendant has not established that
> counsel made this decision for him or coerced him into making it.

> Defendant next asserts that counsel could have called witnesses other than
> himself.  Defendant does not, however, identify any other potential defense witnesses
> or indicate how any other witnesses would have testified.

> Defendant argues that counsel could have questioned the victims' motives
> and suggests that corporal punishment might have been a basis for their accusations.
> However, defendant admitted the facts establishing two of the crimes. Challenging
> the victims' motives for making additional accusations would not likely have led to
> a different result. Moreover, counsel might have believed that such a strategy would
> be ill advised. That defendant engaged in corporal punishment was already on the

---

[4]The Michigan Court of Appeals recited the governing standard from *Strickland*, citing *People v. Odom*, 740
N.W.2d 557 (Mich. Ct. App. 2007).

record, and there is no reason to believe that additional questioning would have served any greater benefit.

Defendant argues that counsel failed to move to suppress his admissions to Detective McDougal. However, counsel conducted a voir dire examination of Detective McDougal and cross-examined Ly relative to the voluntariness of defendant's statements. The questioning revealed that Detective McDougal wore plain clothes when interacting with defendant and drove an unmarked car with no interior cage or other markings of it being a police vehicle, that defendant was not handcuffed and was voluntarily escorted to the police station and taken immediately to an interview room, that he was cooperative, and that he was affirmatively told he was free to leave and was not under arrest. Ly testified that defendant did not indicate at any time that he wanted to leave or that he felt uncomfortable. A confession is admissible if it "'is made freely, voluntarily, and without compulsion or inducement of any sort.'" *People v Daoud*, 462 Mich 621, 631; 614 NW2d 152 (2000) (citation omitted). There being no evidence of compulsion or inducement, a motion to suppress likely would have been futile.

Defendant takes issue with the fact that counsel did not challenge the admission of evidence under MCL 768.27a. However, he does not identify any basis for challenging the admission of evidence of uncharged conduct under this statute.

Defendant next asserts that counsel failed to cross-examine any witnesses. However, counsel cross-examined the older stepdaughter, Detective McDougal, and Ly. Counsel did not cross-examine the younger stepdaughter due to a trial strategy he explained on the record, stating:

> there were some things said that could be argued in closing argument with regard to [the younger stepdaughter's] statements, and if I were to cross-examine her, I believe that would have opened up other lines of questions for rehabilitation with the prosecution.

Presumably, the "statements" referred to by counsel was the younger stepdaughter's testimony that defendant's tongue was on, not in, her vagina. Counsel's strategy was not sound, as discussed below. Defendant has not established, however that cross-examining the younger stepdaughter would have brought any additional evidence to light or been effective.

Further, contrary to defendant's claim, counsel made short opening and closing statements. During closing, counsel sought to refocus the court on the actual charges. He argued that the digital penetration of the younger stepdaughter was not for sexual purposes; however, the court correctly noted that this was not an element with regard to a charge of penetration. See *People v Szalma*, 487 Mich 708, 725-726; 790 NW2d 662 (2010); MCL 750.520b; MCL 750.520a(r). Counsel noted

defendant's denial of oral sex with the younger stepdaughter and argued that, based on her testimony that defendant's tongue was on but not in her vagina, there was no evidence of penetration. However, defendant needed only to penetrate the labia, not the vagina. See *People v Bristol*, 115 Mich App 236, 237-238; 320 NW2d 229 (1981). There was evidence supporting penetration of the labia. Further, counsel asserted, erroneously, that the older stepdaughter had not testified regarding digital penetration.

Counsel erred in devising a strategy and argument based on mistakes of law and fact. However, defendant cannot establish a reasonable probability that, but for counsel's errors, the result would have been different. Before counsel became involved in the case, defendant admitted to two of the crimes, apparently thinking they were defensible. Given these admissions, in addition to the testimony of the stepdaughters, it is highly unlikely that defendant would have been acquitted but for counsel's errors.

(MCOA Op. 3-4.)

The state court's discussion of the foregoing claims was neither contrary to, nor unreasonable application of, established federal law. Nor was it an unreasonable determination of the facts presented. Petitioner challenges the state court's decision on the basis that prejudice should be "presumed," because counsel failed to subject the government's case to any "meaningful adversarial testing," citing *United States v. Cronic*, 466 U.S. 648 (1984). (Pet'r's Reply, docket #14, Page ID#101.) Before prejudice can be presumed under *Cronic*, however, the attorney's failure to test the prosecutor's case "must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002); *see also Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002) (stating that *Cronic* applies "only where the constructive denial of counsel and the associated collapse of the adversarial system is [e]minently clear"). Petitioner's counsel gave a brief opening statement, cross-examined several witnesses, attempted to exclude evidence, permitted Petitioner to testify in his own defense, and gave a brief closing statement. In light of the foregoing, Petitioner cannot claim "that his counsel failed to oppose the prosecution throughout the . . . proceeding as a whole"; instead, Petitioner is essentially

- 19 -

arguing "that his counsel failed to do so at specific points," which does not trigger the presumption of prejudice under *Cronic*.  *See Bell*, 535 U.S. at 697; *cf. Moss*, 286 F.3d at 861 (declining to apply *Cronic* where defense counsel did not cross-examine key eyewitnesses).  Moreover, Petitioner does not indicate what evidence or strategy would have been available to subject the prosecution's case to meaningful testing.  Petitioner's disagreement with his counsel's choices does not render them unreasonable, let alone a complete failure of representation such that prejudice may be presumed. In short, the state court was not unreasonable in applying the *Strickland* standard, rather than the presumption of prejudice in *Cronic*, to Petitioner's case.

One issue raised by Petitioner that is not discussed in the state court's opinion is Petitioner's contention that his counsel was ineffective because he "didn't explain about [a] plea deal." (Pet., docket #1, Page ID#6.) On appeal, Petitioner asserted that his counsel "never explained anything . . . about the court, laws, plea deal.  Nothing."  (Def.-Appellant's Aff. in Supp. of Supplemental Br. on Appeal, docket #11.)  In his reply to Respondent, Petitioner contends that counsel never "explain[ed]" the plea offer "in full detail."  (Reply 5, docket #14, Page ID#103.) Petitioner supports his claim with a letter from his counsel, which states, "I had a plea deal secured that would have reduced your sentence by ten years.  You disregarded my advice and the advice of your daughter and proceeded to trial."  (*See* 9/16/2010 Letter, docket #11.)

A defendant who has been offered a plea deal has a Sixth Amendment right to effective representation during plea negotiations.  In *Missouri v. Frye*, 132 S. Ct. 1399 (2012), the Supreme Court held that defense counsel has a duty to communicate (and explain) plea offers containing terms that may be favorable to the defendant.  *Id.* at 1408.  To show prejudice, however, a petitioner "must demonstrate a reasonable probability [he] would have accepted the earlier plea

offer had [he] been afforded effective assistance of counsel." *Id.* at 1409.  Here, Petitioner implicitly acknowledges that his attorney informed him of the plea offer, but contends that his attorney did not explain it in full detail.  Petitioner does not identify the details that counsel should have explained to him, however.  Nor does he claim, let alone demonstrate, that he would have accepted the plea offer had he been given a more detailed explanation.  Consequently, Petitioner's claim is without merit because he has not established that his counsel's allegedly ineffective assistance prejudiced him.

### Ground Two: Right to Counsel of Choice

Next, Petitioner asserts that the trial court deprived him of counsel of his choice when it refused to allow him to remove his attorney and secure substitute counsel.  The court of appeals addressed his claim as follows:

> At the beginning of the second day of the two-day trial, defendant requested that his attorney, whom he had privately retained, be removed as his counsel. By way of explanation, defendant tendered a letter that is not in the record, which he had asked a person who was incarcerated with him to write on his behalf. However, the letter apparently mirrored accusations made in a grievance defendant filed against counsel, adding only the concern that counsel had not cross-examined the younger stepdaughter. Counsel noted that the grievance would have given him grounds to withdraw, but he did not think doing so would be in his client's best interests. He advised that he had received letters written on defendant's behalf by the same person who had written the letter tendered to the court. He said that after receiving such letters he spoke with defendant and was assured everything was fine, only to receive more letters.  Counsel's impression was that the person writing the letters for defendant was giving defendant very bad advice. Counsel noted that the case was difficult, that he had negotiated strongly for defendant, that he had made some "shrewd moves procedurally," and that he had protected defendant's interests to the best of his ability. The trial court indicated that defendant's "jailhouse attorney" was not giving good advice and concluded that it was not "going to require [counsel] to withdraw . . . at this late date."

> We review a trial court's decision affecting a defendant's right to counsel of his choice for an abuse of discretion. *People v Akins*, 259 Mich App 545, 556; 675 NW2d 863 (2003). We also review a trial court's decision on a motion for a

continuance for an abuse of discretion. *People v Steele*, 283 Mich App 472, 484; 769 NW2d 256 (2009). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . the assistance of counsel for his defense." See also Const 1963, art 1, § 20. The United States Supreme Court has held that "an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v Gonzalez-Lopez*, 548 US 140, 144 (2006). But this right is not absolute. See *id*. at 151-152. A trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Id*. at 152 (citations omitted).

> "When reviewing a trial court's decision to deny a defense attorney's motion to withdraw and a defendant's motion for a continuance to obtain another attorney, we consider the following factors: (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant is merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision." [*Akins*, 259 Mich App at 556, quoting *People v Echavarria*, 233 Mich App 356, 369; 592 NW2d 737 (1999).]

Here, defendant raised a constitutional right—his right to the counsel of his choice. But the trial court indicated that defendant's request for new counsel was premised on bad advice from a "jailhouse attorney," suggesting there was no bona fide dispute between defendant and counsel. Even if there were a bona fide dispute, however, defendant was negligent in asserting the right mid-trial. All of the reasons defendant gave for requesting new counsel, but for counsel's failure to cross-examine the younger stepdaughter, had been previously identified by defendant, yet he waited until the second day of trial to make the request. Moreover, defendant has not established that any prejudice resulted from the trial court's decision. Under these circumstances, the trial court did not abuse its discretion in denying defendant's request to remove counsel.

(MCOA Op. 4-5 (parallel citations and footnote omitted).)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The Supreme Court has held that "an element of this right is the right of a defendant who does not require appointed counsel to

choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). The defendant's right is not unqualified, however. "Trial judges necessarily require a great deal of latitude in scheduling trials. . . . Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (citation and internal quotations marks omitted). Thus, "'when the granting of the defendant's request would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference.'" *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (quoting *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008)). The Sixth Circuit has held that, "[t]o substitute counsel during trial, the defendant must show good cause, such as 'a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney.'" *Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011) (quoting *United States v. Sullivan*, 431 F.3d 976, 979-80 (6th Cir. 2005)). Finally, to establish a constitutional claim, the defendant need only show that the trial court erroneously deprived him of his counsel of choice; he need not additionally show that the error prejudiced him. *Gonzalez–Lopez*, 548 U.S. at 146.

   The state court rejected Petitioner's claim for several reasons: he was negligent in presenting his request in the middle of trial; it appeared that Petitioner's dispute with his counsel was not "bona fide"; and Petitioner did not show prejudice as a result of the state court's decision. According to the Supreme Court, prejudice is not *required* to establish a constitutional claim. *See Gonzalez–Lopez*, 548 U.S. at 146. Nevertheless, the state court's decision survives scrutiny under the AEDPA, for the other reasons cited by the court.

Regarding the timing of Petitioner's motion, the state court noted that Petitioner could have presented his request at an earlier date, but failed to do so.  According to counsel, Petitioner had previously lodged an attorney grievance raising virtually all of the same concerns.  That grievance was received by counsel on October 27, 2009.  Petitioner, however, did not request withdrawal of his counsel until November 20, 2009, after the first day of trial.  There is no evidence that Petitioner had already secured substitute counsel to represent him at that date.  Thus, granting Petitioner's motion necessarily would have required a delay in the proceedings, and the state court's decision not to permit such a delay is entitled to "extraordinary deference."

With regard to Petitioner's reasons for seeking substitution of counsel, the state court concluded that Petitioner had not demonstrated a "bona fide" dispute with his attorney, as his request appeared to have been prepared by a "jailhouse attorney" who, according to Petitioner's counsel, had previously written similar letters to counsel on Petitioner's behalf and was providing "bad advice."  (MCOA Op. 5.)  While the precise nature of Petitioner's complaints about his attorney do not appear on the record (other than that counsel waived the preliminary examination and did not cross-examine a witness on the first day of trial), nothing in the record suggests a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict, and Petitioner fails to identify facts or evidence from which to conclude that one existed.  Indeed, the record suggests otherwise.  On the first day of trial, when Petitioner sought to waive his right to a jury trial, Petitioner's counsel indicated that he met with Petitioner several times regarding the issue, and that Petitioner himself had requested the waiver.  (Tr. I, at 15.)  When questioned by the court about the waiver, Petitioner acknowledged that he had received a sufficient opportunity to confer with his attorney on the matter; he expressed no concerns about his counsel at that time.  (*Id.* at 13.)

Petitioner did not claim, as he does in this action, that his counsel "wasn't doing anything for him," and "did nothing but yell at him [e]verytime he see[s] him."  (Pet., docket #1, Page ID#7.)  In addition, the fact that Petitioner failed to present his request earlier tends to bolster the state court's conclusion that his complaints were not genuine, or were not so serious as to require a last-minute substitution.

Petitioner implies that his attorney was subject to a conflict of interest, citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980).  It is clearly established federal law that a defendant's Sixth Amendment right to counsel is violated "when counsel is burdened by an actual conflict of interest." *Strickland*, 466 U.S. at 692.  In *Cuyler*, the Supreme Court held that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."  *Cuyler*, 446 U.S. at 349-50.  *Cuyler*'s standard of proof has never been extended by the Supreme Court to any conflict other than joint representation of co-defendants, which is not the type of conflict asserted by Petitioner.  *Smith v. Hofbauer*, 312 F.3d 809, 818 (6th Cir. 2002) (citing *Mickens v. Taylor*, 535 U.S. 162 (2002)).  Thus, *Cuyler* is inapposite. Moreover, Petitioner's disagreement with his counsel's trial strategy did not impose a conflict of interest on his counsel.

Petitioner also argues that the trial court failed to adequately inquire into the reasons for his motion by conferring with Petitioner "privately."  (Def.-Appellant's Supplemental Br. on Appeal, docket #11.)  Although the record contains no evidence that the court questioned Petitioner privately regarding his concerns, the trial court did review a letter stating Petitioner's reasons for seeking withdrawal of counsel.  Petitioner has not demonstrated that his private letter to the court did not fully express his complaints with the attorney he had chosen.  The court also heard from

Petitioner's counsel regarding those concerns.  All of this could reasonably be found to have provided the trial court with an adequate basis for making its decision.  While the Sixth Circuit has held that the adequacy of a court's inquiry into a defendant's request for substitution of counsel is one factor it considers when evaluating the denial of a motion for substitute counsel, *see Henness*, 644 F.3d at 321, the Supreme Court has not established a specific right for a defendant to confer *privately* with the trial court in connection with such a motion.  Consequently, the trial court's election not to conduct an *in camera*  inquiry into Petitioner's concerns under these circumstances did not violate his constitutional rights.

In sum, I cannot conclude that the state court's decision was an unreasonable determination of the facts, or was either contrary to, or an unreasonable application of, clearly established federal law, particularly in light of the "extraordinary deference" accorded to trial courts in these circumstances. *See Vasquez*, 560 F.3d at 467.  Petitioner's case does not present an instance of "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay."  *See Morris*, 461 U.S. at 11-12.  Thus, Petitioner's claim is without merit.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  July 3, 2014                                        /s/ Hugh W. Brenneman, Jr.
                                                                      HUGH W. BRENNEMAN, JR.
                                                                      United States Magistrate Judge

- 26 -

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).